IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VALERIE L. HOOVER,

        Plaintiff,

vs.

                                    Civil Action 2:15-cv-2944
                                    Judge Michael H. Watson
                                    Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Valerie L. Hoover, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 19), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.     BACKGROUND

Plaintiff filed her applications for benefits on May 1, 2012, alleging that she has been disabled since September 1, 2004, due to strokes, poly fibromyalgia, degenerative disc disease,

myoclonus, neuropathy, carpal tunnel syndrome, asthma, anxiety, and depression.  (R. at 222-30, 231-37, 263.)  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  Administrative Law Judge Karen B. Kostol (the "ALJ") held a video hearing on May 5, 2014, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 39-70.)  Larry Ostrowski Ph.D., a vocational expert, also appeared and testified at the hearing.  (R. at 70–77.)  On June 16, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 10-25.)  On August 21, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives with her nine-year-old daughter.  (R. at 40.)  She has a driver's license but is not allowed to drive due to seizures.  (R. at 40-41.)  When discussing her education, Plaintiff replied that she did graduate but she received special education services.  (R. at 41.)   She can read, write, and do "simple math."  (*Id.*)  She did obtain certificates in graphic arts and business data accounting from a vocational school but noted she "barely" obtained them.  (R. at 41-42.)

When asked why she felt she could not work, Plaintiff replied, "I'm not able to function and be around a lot of people.  I feel like I get closed in.  And I can't stand for a long period of time or sit."  (R. at 46.)

Plaintiff estimated that she can stand for twenty minutes and sit for ten to fifteen minutes at a time.  (R. at 47.)  She testified to having at least one seizure a day that lasts for a minute,

though a "bad" day may include as many as eight. (R. at 48.) She takes the medication Lamictal for her seizures, which "seems to be working . . . A little bit." (R. at 49.)

Plaintiff also takes the medication Lyrica, which helps ease her fibromyalgia pain. (R. at 47.) She described that her pain is so bad, for half the month she "can't hardly do anything." (R. at 52.) On her "bad" days, Plaintiff's mother helps take care of her daughter. (R. at 53-55.)

Plaintiff testified that she needs to elevate her legs about ten days out of the month. (R. at 47.) She has difficulty using her right hand due to numbness. (R. at 56-57.) Plaintiff also testified to feeling fatigued a couple days a week, and needing to lie down. (R. at 57-58.) She uses a cane about ten days a month, but did not remember whether it had been prescribed. (R. at 59.) She obtained the cane from a friend of someone at her church. (*Id.*) She believes she can walk about half a block before she will need to stop. (R. at 60.) She sleeps in the downstairs level of her house to avoid having to use the stairs and to be close to the bathroom. (R. at 64.) Her sister-in-law does home chores for her, and her mother helps her grocery shop once or twice per month. (R. at 68-69.) She attends church six or seven times per month, and talks with friends three times a week while her daughter is in school. (R. at 60, 65-67.)

As to her mental impairments, Plaintiff testified that she has not gone to counseling because her insurance allows a limited number of visits per year. (R. at 49.) As a result, she sees a psychiatrist every three months. (R. at 50.) Plaintiff discussed memory issues she experiences, wherein she will "lose track" in a conversation. (R. at 50-51.) She has problems staying on task with respect to chores like housekeeping and cleaning. (R. at 51.) Plaintiff also testified that she gets panicked when around other people, so she avoids going out in public. (R. at 60-61.) She does take medications to ease her anxiety, but still consciously avoids going out in public. (R. at 61.)

**B.**     **Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs include a cashier/checker, a light, semiskilled position; and a deli cutter/slicer, a light, unskilled position.  (R. at 72.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 72-74.)  Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that a similarly-situated hypothetical individual could not perform Plaintiff's past work, but could perform approximately 2,275,000 light exertion, unskilled jobs in the national economy such as an office helper, a mail clerk, and a sewing machine operator.  (R. at 73-74.)  The VE also testified if Plaintiff's RFC was reduced to sedentary, she could still perform work as document preparer, table worker, and ampoule sealer.  (R. at 74-75.)

The VE testified that Plaintiff could not maintain competitive employment if she was off task up to 20 percent of the workday or workweek.  (R. at 75.)

When examined by Plaintiff's counsel, the VE testified that an absence from work four times per month would result in the loss of each of the aforementioned jobs.  (R. at 76.)

### III.     MEDICAL RECORDS

**A.**     **Physical Impairments**

1.     <u>Trinity Family Health Center</u>

Plaintiff complained to Stephanie Batalo, C.F.N.P., of aching arms with numbness into her hands on February 29, 2012.  (R. at 338.)  Plaintiff was found to have a positive Phalen's maneuver on examination and diagnosed with carpal tunnel syndrome.  Ms. Batalo noted Plaintiff "wants to wait" regarding treatment.  (R. at 337.)

4

2.    Shalu Singh, M.D.

Dr. Singh, a neurologist, initially saw Plaintiff when she was admitted to the hospital after she had a syncopal episode on September 10, 2012. (R. at 427.) When seen for hospital follow-up on September 12, 2012, Plaintiff reported episodes where she went into a daze. On examination, Dr. Singh, noted severe exogenous obesity, a subjective loss of sensation in the upper and lower extremities, brisk reflexes, a broad based gait, and a positive Rhomberg's sign. (R. at 422.) He noted that EEG testing had been negative for seizure activity. Dr. Singh started Plaintiff on Lamictal and ordered an EMG nerve conduction study of the upper and lower extremities for the neuropathy. (R. at 423.)

When seen on September 26, 2012, Plaintiff reported less seizures and better mood and indicated going up and down stairs to use the bathroom in her house made her very tired. (R. at 421.)

On October 11, 2012, Plaintiff reported her vision and headaches had improved on Lamictal. (R. at 420.)

On January 28, 2013, Dr. Singh found a positive Tinel's sign over the bilateral wrists with decreased sensation over the lateral three digits of the bilateral hands. Dr. Singh increased Plaintiff's dosage of Lamictal and ordered an EMG of her upper extremities. (R. at 467-68.)

On February 19, 2013, Dr. Singh again found a positive Tinel's sign, decreased sensation in the bilateral median nerve and wrist, and complaints of muscle spasm and trigger points throughout the body. (R. at 465.) Dr. Singh noted that the EMG nerve conduction[1] study did not

---

[1]The only EMG report the Court could locate in the administrative record was taken on April 5, 2010 and was normal. (*See* R. at 632-33.)

show any carpel tunnel syndrome but her symptoms are suggestive, so he prescribed wrist splints, Lyrica 150 milligrams, and Flexeril.  (R. at 465-66.)

       3.    <u>Amrik Chattha, M.D.</u>

Plaintiff consulted with Dr. Chattha in February and June, 2012, due to anxiety, tension, headache, and poor balance.  Dr. Chattha noted that Plaintiff was obese and that nerve conduction studies and EMG testing of Plaintiff's lower extremities had been normal.  Dr. Chattha recommended she continue her medications and seeing her psychiatrist.  (R. at 586-87.) In June 2012, Plaintiff's major concern was tingling and numbness of her upper extremities as well as lower extremities.  Polyneuropathy and some etiology were considered, so Dr. Chattha recommended a comprehensive metabolic profile, as well as EMG and motor nerve conduction velocity of all the four extremities.  (R. at 586.)

       4.    <u>William Padamadan, M.D.</u>

Plaintiff was evaluated for disability purposes by Dr. Padamadan on August 16, 2012. (R. at 406-12.)  Plaintiff's chief complaints included fibromyalgia and neuropathy.  (R. at 406.) On examination, Dr. Padamadan noted that Plaintiff presented with a cane, which was not obligatory.  Dr. Padamadan found that typical trigger points were not demonstrable except for superficial skin touch without pressure causing sensitivity.  Plaintiff had full muscle strength in her arms.  She did not walk with a limp, and straight leg raises were negative.  Her lung sounds were normal with no wheezes or crackles, heart sounds were normal with no murmurs or gallops. She had an umbilical hernia repair with a protrusion of a ventral hernia about a dollar size at the site of the umbilical hernia.  Dr. Padamadan found no clinical signs of arthritis of the small or large joints.  Plaintiff exhibited mildly decreased range of motion in her lumbar spine, and bilateral knees.  (R. at 407, 409-12.)  Dr. Padamadan noted that he thought the muscle testing of

lower extremities was not reliable.  (R. at 409.)  Dr. Padamadan diagnosed Plaintiff with morbid

obesity, history of fibromyalgia and soreness everywhere (without the classic pressure point

symptoms), and history of neuropathy without any sensory abnormalities.  (R. at 408.)  Dr.

Padamadan opined Plaintiff had no limitation in ability to perform at least "sedentary light duty

activities" with no climbing on poles or ladders, crawling, or kneeling.  (*Id.*)

     5.    <u>State Agency Evaluation</u>

On September 8, 2012, state agency physician, Michael Lehv, M.D., reviewed the record

and assessed Plaintiff's physical functioning capacity.  (R. at 80-90.)  Dr. Lehv opined that

Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand

and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at 88.)

Dr. Lehv found that Plaintiff was limited in push and/or pull in her lower extremities.  (*Id.*)

According to Dr. Lehv, Plaintiff could frequently climb ramps/stairs and balance; occasionally

stoop, kneel, crawl, or crouch; but never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Lehv also

found Plaintiff would be limited on unprotected heights due to her conditions.  (R. at 89.)  As to

Plaintiff's credibility, Dr. Lehv noted that he had "serious issues."  He explained that Plaintiff

"did not provide accurate height and weight information, misled or attempted to mislead [Dr.

Padamadan] about her surgeries, neuropathy and was considered unreliable on strength testing.

In addition she had zero fibromyalgia trigger points and her cane was not medically necessary."

(*Id.*)  Dr. Lehv assessed Dr. Padamadan's opinion as "less persuasive" because it was "without

substantial support from other evidence of record."  (R. at 90.)

Anton Freihofner, M.D. reviewed Plaintiff's records upon reconsideration on December

7, 2012, and opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-

five pounds frequently; stand and/or walk about six hours in a workday; and sit for about six

hours in a workday. (R. at 118.) Dr. Freihofner found that Plaintiff could frequently climb

ramps/stairs, balance, stoop, kneel, crawl, or crouch; but never climb ladders, ropes, or scaffolds.

(*Id.*) Dr. Freihofner based Plaintiff's postural limitations on her morbid obesity, history of

fibromyalgia and questionable seizure disorder. (*Id.*) Also, due to her seizure disorder, Dr.

Freihofner limited Plaintiff to no unprotected heights, dangerous machinery, or commercial

driving. (R. at 119.) Dr. Freihofner found Dr. Padamadan's opinion "less persuasive" because:

(1) the opinion relies heavily on the subjective report of symptoms and limitations provided by

the individual, with the totality of evidence not supporting the opinion, (2) the opinion contains

inconsistencies, (3) the opinion is without substantial support from other evidence of record; (4)

and the opinion is an overestimate of the severity of the individual's restrictions /limitations

based only on a snapshot of the individual's functioning. (R. at 120.)

**B.    Mental Impairments**

    1.    <u>David R. Bousquet, M.Ed.</u>

Plaintiff was evaluated for disability purposes by Dr. Bousquet on July 24, 2012. (R. at

396-404.) Plaintiff applied for disability because of problems with depression and anxiety,

health and medical reasons, and difficulties with learning. (R. at 397.) Plaintiff reported that she

had been in special education classes, had repeated kindergarten, and had experienced difficulty

in school. (*Id.*) She last worked in 2004 as a cashier at Walmart, which she found difficult due

to the need for constant interactions with people. She subsequently left her job due to pregnancy.

(R. at 398.) As to her activities of daily living, Plaintiff reported that she does some chores and

gets help from her sister-in-law. She takes care of her child, watches television, visits with her

friends and family and attends church. She was in a pool league but did not always attend. She has a driver's license but no vehicle. (R. at 399.)

On mental status examination, Dr. Bousquet reported that Plaintiff was dressed appropriately, cooperative, her speech was normal, her affect was appropriate, mood was sad, anxious, and fearful at times, she appeared restless and fidgety, and had trouble attending and concentrating at times when anxiety was evident. She was alert and oriented x4, reasoning and judgment capabilities appear to fall at age-appropriate levels. (R. at 400-01.)

Plaintiff was administered the Wechsler Adult Intelligence Scale ("WAIS") which resulted in a verbal comprehension score of 74, perceptual reasoning of 67, working memory of 83, processing speed of 71, and a full scale of 68. At times she did struggle with understanding directions, requiring their rewording. Dr. Bousquet opined that these scores appeared reliable and valid assessment of current abilities and functioning. (*Id.*)

Dr. Bousquet diagnosed Plaintiff with bipolar disorder, panic disorder without agoraphobia, and borderline intellectual functioning. (R. at 401.) Dr. Bousquet assigned Plaintiff a GAF score of 50. (*Id.*) Dr. Bousquet opined that Plaintiff would have some difficulties with her abilities to understand, remember, and carry out instructions in the work setting; to maintain attention and concentration; to maintain an acceptable persistence and pace in a work setting; to conform to social expectations in a work setting; and to respond appropriately to work place stresses and pressures. (R. at 402-03.)

2. State Agency Evaluations

On July 30, 2013, after review of Plaintiff's medical record, Tonnie Hoyle, Psy.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had moderate

restrictions in her activities of daily living; mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration.  (R. at 86.)  She further determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*)  Dr. Hoyle gave great weight to Dr. Bousquet's opinion finding it consistent with the overall evidence in file.  (R. at 87.)

In completing the MRFC,[2] Dr. Hoyle opined that Plaintiff was moderately limited in her abilities to understand and remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting.  (R. at 102-04.)  Dr. Hoyle concluded that Plaintiff can understand, remember, and carry out simple task instructions; maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks; and can adapt to settings in which duties are routine and predictable.  (*Id.*)

On December 6, 2012, Paul Tangeman, Ph.D. reviewed the record upon reconsideration and found Plaintiff would have moderate difficulties in all "B" Criteria areas.  (R. at 115-16.) Dr. Tangeman found Plaintiff's mental allegations are credible.  She presents with decreased attention span and some anxiety.  Due to borderline intellectual functioning, she would have moderate limitations for work.  She struggled to understand some directions at consultative

---

[2] "MRFC" is a residual functional capacity which limits its consideration to mental capabilities.

evaluation.  However, she is able to carry out her activities of daily living and relates with others

on a regular basis.  (R. at 117.)

## IV.  THE ADMINISTRATIVE DECISION

On June 16, 2014, the ALJ issued her decision.  (R. at 10-25.)  Plaintiff met the insured

status requirements through March 31, 2009.  At step one of the sequential evaluation process,[3]

the ALJ found that Plaintiff had not engaged in substantially gainful activity since September 1,

2004, the alleged onset date of disability.  (R. at 12.)  The ALJ found that Plaintiff had the severe

impairments of fibromyalgia; polyarthropathy; anxiety; depression; borderline intellectual

functioning; obesity; and epilepsy/pseudoseizures/conversion reaction.  (*Id.*)  She further found

that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 13.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

The undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except work must: never entail climbing of ladders, ropes, or scaffolds; entail only occasional climbing of ramps or stairs, but can frequently balance, stoop, crouch, kneel or crawl; avoid all hazards (dangerous moving machinery and unprotected heights); be limited to simple, routine, and repetitive tasks in a low stress job (only occasional decision making required, occasional changes in work setting, and no strict production quotas); entail only occasional interaction with the general public, co-workers, and supervisors.

(R. at 16.)  In reaching this determination, the ALJ "considered the opinions of Dr. Padamadan and afford them more weight than other opinions in the record as they support the limited findings in his objective evaluation as well as the limited objective testing reports contained within the longitudinal record." (R. at 17-18.)  The ALJ assigned "significant weight" to the opinions of the state agency reviewing physicians, Dr. Lehv and Dr. Freihofner.  (R. at 23.)  The ALJ also assigned "significant weight" to the opinions of the state agency reviewing psychologists, Drs. Hoyle and Tangeman, who opined that Plaintiff's condition did not meet or medically equal any listed impairment.  (R. at 23-24.)

The ALJ found that Plaintiff's symptom exaggeration reflects negatively on her credibility regarding her allegedly disabling conditions.  (R. at 19.)  The ALJ also found that the above RFC adequately accommodates any residual limitations Plaintiff may experiences due to her seizure condition by limiting Plaintiff to low stress unskilled light exertional work with postural and environmental limitations.  (R. at 20.)  Further, the ALJ found that the above RFC more than adequately accommodates Plaintiff's mental health conditions by limiting her to unskilled low stress work that entail only occasional interaction with the general public, co-workers, and supervisors.  (R. at 21.)

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ next found that Plaintiff has never had earnings representative of yearly substantial gainful activity levels of employment. The ALJ, therefore, found that Plaintiff has no past relevant work. (R. at 24.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. at 24-25.) She therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 25.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LEGAL ANALYSIS

In her Statement of Errors, Plaintiff argues that: (1) the ALJ erred in not finding Plaintiff's impairment of borderline intellectual functioning meets Listing 12.05C; (2) the ALJ erred in assessing Plaintiff's physical residual functional capacity; and (3) the ALJ erred at Step 5 by relying on Vocational Expert testimony elicited in response to an incomplete hypothetical question.  (ECF No. 14 at Pg. 11-20).

### A.    ALJ's Findings Related to Listing 12.05

"At step three of the evaluation process, it is the burden of the claimant to show that he [or she] meets or equals the listed impairment." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004).  Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, he [or she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728.

The United States Court of Appeals for the Sixth Circuit has emphasized that there is no

"heightened articulation standard" in considering the listing impairments.  *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (holding that an ALJ is not obligated to "spell[] out every consideration that went into the step three determination").  Instead, the Court reviews whether substantial evidence supports the ALJ's findings.  *See id.*  The Sixth Circuit has held, however, that an ALJ's decision must contain sufficient analysis to allow for meaningful judicial review of the listing impairment decision.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (remanding where "[n]o analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing under section 1.00").  In remanding for a lack of analysis, the *Reynolds* Court emphasized that it was "possible that the evidence [the claimant] put forth could meet" Listing 1.04.  *Id.* at 416.

Another district court has recognized that the requirements for an ALJ's listing impairment analysis are "[not] so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three . . . ." *Staggs v. Astrue*, No. 2:09–cv–00097, 2011 WL 3444014, at *4 (M.D. Tenn. Aug. 8, 2011). Rather, the Sixth Circuit has implicitly acknowledged that a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis.  *See Bledsoe*, 165 F. App'x at 411 (finding that an ALJ appropriately considered a claimant's combined impairments at step three in part because "[t]he ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings").  Various federal courts have acknowledged that other portions of an ALJ's decision may justify his or her step-three conclusions.  *See, e.g.*, *Smith v. Astrue*, No. 11–1574, 2011 WL 6188731, at *1 (4th Cir. Dec. 14,

15

2011) (using an "ALJ's analysis at subsequent steps of the evaluation" to find that substantial evidence supported the step-three determination); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (holding that an ALJ's findings at step four and five precluded a claimant from qualifying for a listing under step three).

In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Listing 12.05 covers the impairments related to intellectual disability. Specifically, as applicable to Plaintiff, Listing 12.05 stated:[4]

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirement in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05(C).

20 C.F.R. 404, Subpt. P, App. 1 § 12.05. Accordingly, to meet the requirements of 12.05(C), Plaintiff must show an "onset of the significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22." *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001) (internal quotations omitted). Additionally, Plaintiff must demonstrate a valid verbal, performance, or full scale IQ score that meets the Listings requirement ranges. *See Turner v. Comm'r of Soc. Sec.*, No. 09-5543, 2010 WL 2294531 at *3 (6th Cir. 2010).

---

[4] In January 2017, the language of Listing 12.05 was amended, as applicable to social security cases with application filing dates beyond the date of the amendments.

To satisfy the diagnostic description, a claimant must demonstrate three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009). A claimant may meet the onset requirement either directly or circumstantially. Specifically, the Sixth Circuit has found that "[w]hile the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . a claimant is by no means required to produce an IQ score obtained prior to age 22." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 699 (6th Cir. 2007).

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 F. App'x at 677. Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Furthermore, in considering Listing 12.05 the Sixth Circuit has noted "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id.* (quoting DSM-IV-TR at 49).

Turning to the instant matter, the Commissioner concedes that the ALJ erred by discussing record evidence under the wrong element of Listing 12.05C. (ECF No. 19, at 4.)

Nevertheless, the Commissioner asserts, the error was harmless because Plaintiff failed to establish that she met or medically equaled the requirements of Listing 12.05C.

Within her step-three analysis, findings within the ALJ's decision justify her Listing 12.05C conclusion. Despite the ALJ's error in applying a standard under the wrong element of Listing 12.05, she articulated in other portions of her opinion that Plaintiff has neither sub-average general intellectual functioning nor adaptive functioning deficits. Specifically, the ALJ credited Dr. Bousquet's conclusion that Plaintiff had borderline intellectual functioning. (R. at 12.) This conclusion weighs against a finding that Plaintiff suffered from subaverage intellectual functioning within the meaning of Listing 12.05. *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (finding substantial evidence that a claimant did not meet the diagnostic description in part because medical sources diagnosed the claimant with borderline intellectual functioning and the record contained no diagnosis of mental retardation[5]); *West v. Comm'r of Soc. Sec.*, 240 F. App'x at 698-99 (finding a diagnosis of borderline intellectual functioning did not equate to mental retardation); *Justice v. Comm'r Soc. Sec.*, No. 12-3150, 2013 WL 645957, at *12-13 (6th Cir. Feb. 22, 2013) (same). Additionally, Plaintiff has pointed to and the Court's independent review of the record reveals that no treatment professional identified that Plaintiff has significantly subaverage general intellectual functioning. Consequently, the ALJ's finding that Plaintiff failed to demonstrate significantly subaverage general intellectual functioning within the meaning of Listing 12.05C is justified.

---

[5] In August 2013, the term "intellectual disability" replaced the term "mental retardation." Fed. Reg. Vol. 78, No. 148, August 1, 2013.

Moreover, substantial evidence supports the ALJ's decision that Plaintiff does not have deficits in adaptive functioning.  The ALJ credited the findings of Dr. Singh in concluding that the Plaintiff's "conservative treatment history reflects that the claimant's mental health conditions are not as severe as alleged."  (R. at 21.)  As the ALJ noted, Dr. Padamadan also reported few limitations in Plaintiff's functional abilities.  (R. at 22.)  With respect to the activities Plaintiff is able to perform, the ALJ noted that she is "able to prepare meals, take care of her own personal hygiene, and shop."  (R. at 22.)  Plaintiff also "spends her days taking care of her daughter, straightening up, vacuuming, doing dishes, co[o]king and watching television." (*Id.*)  Furthermore, she "attends church, is a member of a pool league, and visits with family and friends several times a week."  (*Id.*)  The ALJ noted that these self-described activities are not consistent with a totally disabled individual.

In maintaining that the ALJ erred in finding no deficits in adaptive functioning, Plaintiff points to the ALJ's observations regarding her vocational schooling and previous employment. (ECF No. 14, at 15.)  But, evidence of work history, as well as educational background may be considered in weighing against finding that the requirements of Listing 12.05(C) are satisfied. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491-92 (6th Cir. 2010) (upholding ALJ decision considering academic record and work experience in finding no adaptive deficits); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (same).  Thus, the record evidence considered by the ALJ supports a finding that Plaintiff has neither subaverage intellectual functioning nor adaptive functioning.  Additionally, Plaintiff's work and educational history is not the only support for the finding on adaptive functioning.  As the Commissioner highlights, in *West v. Commissioner of Social Security*, the Sixth Circuit found that the absence of "marked"

19

limitations supported the ALJ's finding that the claimant was not deficient in adaptive functioning within the meaning of Listing 12.05(C). 240 F. App'x at 698. Here, the evidence of Drs. Hoyle and Tangeman supported the ALJ's findings that Plaintiff did not exhibit "marked" limitations, as both found only moderate restrictions in activities of daily living, mild to moderate restrictions in social functioning, moderate restrictions in maintaining concentration; and moderate restrictions in maintaining concentration, persistence and pace. (R. at 23-24.) As a result of the strength of the record evidence showing the absence of subaverage intellectual functioning and deficits in adaptive reasoning, the ALJ's decision that Plaintiff failed to demonstrate the requisite elements of Listing 12.05(C) is not reversible error.

**B.      Residual Functional Capacity Assessment**

With her second contention of error, Plaintiff asserts that the ALJ erred in her assessment of Plaintiff's residual functional capacity in two aspects: (1) the interpretation of the opinion of Dr. Padamadan; and (2) the absence of manipulative limitations in light of carpal tunnel syndrome. (ECF No. 14, at 16-17.)

With respect to the interpretation of Dr. Padamadan's opinion, Plaintiff focuses on the ALJ's conclusion that she did "not see any indication for limitation of sitting, standing, walking or carrying at least for sedentary light duty activities." (R. at 408.) Plaintiff claims that the ALJ erred in unreasonably interpreting this language to mean she retained the ability to perform light work. Plaintiff argues that Dr. Padamadan's opinion should be interpreted as meaning that Plaintiff could perform sedentary work, or "light duty." The Undersigned is not convinced that the ALJ's interpretation of Dr. Padamadan's opinion was not reasonable. Fatal to Plaintiff's argument, is the fact that, even crediting Plaintiff's interpretation, a limitation to sedentary work

20

would not entitle Plaintiff to benefits. To that end, the vocational expert testified that a number of sedentary jobs could be performed by someone with Plaintiff's vocational profile and residual functional capacity—namely document preparer, table worker and ampoule sealer. (R. at 74.) Thus, any error committed by the ALJ in misinterpreting Dr. Padamadan's opinion was harmless. *See Rabbers*, 582 F.3d at 651.

Plaintiff additionally contends that the ALJ erred in not finding that her diagnosis of carpal tunnel demonstrates a need for additional manipulative limitations. (ECF No. 14, at 18-20.) But, a mere diagnosis does not establish that the Plaintiff was significantly limited from performing basic work activities. *See Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) (examining the doctor's notes to establish the intensity, frequency and duration of pain associated with a condition before finding a severe impairment). Consequently, the ALJ reasonably examined the medical record for evidence regarding any work limitations resulting from the Plaintiff's carpal tunnel diagnosis. Substantial evidence supports this conclusion. For instance, Plaintiff underwent EMG nerve conduction studies that revealed no carpal tunnel syndrome. (R. at 13.) Nevertheless, Dr. Singh continued to treat Plaintiff for carpal tunnel syndrome. (R. at 13.) The ALJ also weighed the opinion of treating physician, Dr. Padamadan, who concluded that Plaintiff's upper extremity functions for handling and fine movements remained intact. (R. at 17-18.) As a result, the ALJ found that carpal tunnel syndrome was not a severe impairment for the Plaintiff, and it did not cause more than minimal work-related limitations. In light of the record medical evidence, the Undersigned is convinced that the ALJ's finding, in this context, was reasonable. Thus, the finding that carpal tunnel did not demonstrate severe work-related impairments for Plaintiff was not in error. *Rogers*, 486 F.3d at 241.

## C.     Reliance on Vocational Expert Testimony

Finally, Plaintiff contests the validity of the hypothetical question posed to the VE, which elicited testimony to the effect that Plaintiff retained sufficient residual capacity to perform a significant number of jobs. "In order for a VE's testimony to constitute substantial evidence that a significant number of jobs exists, the questions must accurately portray a claimant's physical and mental impairments." *Cole*, 661 F.3d at 939. Plaintiff contends that the ALJ erroneously excluded limitations from bilateral hand symptoms, carpal tunnel syndrome and polyarthropathy. (ECF No. 14, at 20.)

The Undersigned finds that the ALJ's hypothetical question incorporated all of the limitations the ALJ found credible and supported by the evidence and, therefore, was proper. In formulating the hypothetical, an ALJ is only "required to incorporate those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, the ALJ concluded that Plaintiff was limited to "low stress unskilled light exertional work with postural and environmental limitations." (R. at 20.) Plaintiff fails to identify other evidence supporting additional RFC restrictions that the ALJ found credible. Accordingly, the ALJ did not err in relying on the VE's testimony.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: February 16, 2017                           ____/s/ *Elizabeth A. Preston Deavers*
                                                     ELIZABETH A. PRESTON DEAVERS
                                                     UNITED STATES MAGISTRATE JUDGE